All right, so the final case for argument this morning is the United States v. Union Oil Company of California. Let's see, we have Mr. Mergen and Mr. Campbell. Mr. Mergen, are you— Oh, you're right. Thank you, Mr. Campbell. Whenever you're ready. May it please the Court, Counsel Bruce Campbell, on behalf of the appellants. With the Court's permission, I'd like to reserve five minutes for rebuttal. All right, watch the clock. Thank you. This appeal presents a fundamental question under CERCLA. Namely, in cases when the government is an adjudicated polluter of a site, can it maintain a cost recovery action against a co-polluter under CERCLA Section 107, or must it seek equitable allocation under CERCLA Section 113? The answer to that question is that the government is obligated to— and its sole remedy lies under CERCLA Section 113. And that outcome is mandated by the Supreme Court's case in Atlantic Research, by this Court's opinion in Whitaker, and by the text of CERCLA itself. So when all three of those are read in conjunction, it compels the conclusion that the government has to proceed under Section 113F1 for equitable contribution. Let me ask you this. You know, when I got through reading your brief and thinking about your argument, it just seems to me that it just kind of ignores our prior opinion in this case. The United Circuits published opinion, and I think it was 2002. I think, if I could anticipate where you're going with this, Your Honor, I think in the first case, in the first Shell case in 2002, this Court ruled that the government was liable for all benzol contamination. And it also said, what else did it say? That the oil companies were liable for all non-benzol contamination. So you have two parties. I'll refer to the oil companies as one party. You have two parties who are jointly and severally liable for the contamination at the McCall site as a whole. That's not what we said. The Court did not even reach that issue. It just reached the issue. We said that we didn't have to go on further to consider the argument. We said the other part of the government's argument was moot. We said the government was only really responsible for the benzol. The cost of the benzol. Correct, correct. And, yeah, that's exactly what the case said. But then you have the question, you have two parties that are jointly and severally liable for the contamination as a whole. In order to say that the government is liable only for benzol contamination, you would have to determine that benzol contamination is divisible. Can the parties divide that? I mean, the parties divided it. They assigned a percentage of 6.25% to the benzol contamination. There was a volumetric apportionment in 2003 in connection with when the case went back to the District Court. But that was simply a volumetric allocation for purposes of, in the oil company's view, and it's shown by the document itself, the oil companies believe that the District Court should have conducted additional 113F1 hearing to assign equitably allocate responsibility for the totality of the pollution of the contamination. Are we talking about today this non-benzol contamination? Correct? Correct. That would be for non-benzol contamination. And that's contamination the government is not responsible for under the case law now, right? Under this Court's case law, the Court said the oil companies were responsible for 100% of the non-benzol contamination. Correct. The government came in and cleaned up some of the non-benzol contamination. Correct? Correct. The government has come in and cleaned up all contamination at the site. It included some of the non-benzol contamination, and the government now says they should recover part of the cost of having done that, right? Well, the government is trying to allocate based on the volumetric apportionment that the parties stipulated to in 2003. Why doesn't that work? Because, okay. That's what you guys agreed to, 6.25%. Simply that that was the volumetric allocation. In the same document, and I'll pull it out. It's in the excerpt of record at 107. The footnote 1, it said, for purposes of determining the allocation, the United States and the oil companies stipulate that 6.25% is a proper share of benzol waste at the site. That's as far as the stipulation goes. That's the share of the waste. The government and the oil companies then parted company. The government said, we don't need any more allocation proceedings. The oil companies said, yes, we do, because that's all we've done is stipulate to the volumetric apportionment. When you're allocating liability, you look at the Gore factors. There are a number of other factors that the court looks at to determine how to equitably apportion liability. Was the government conducting these cleanups in response to a court order or a settlement? Was there something that compelled them to do this? Thank you. The government was – this court had adjudicated that the government was liable for 100% of the cleanup costs for benzol waste. And the benzol waste and the non-benzol waste were commingled at the McCall site. In order to – for the government to prevail, the government would have to – it's essentially trying to make an end run around joint and several liability. The government's saying, we're responsible only for benzol waste contamination, and that's only 6.25% of the volumetric allocation. But in order to prove divisibility, the government would have to first plead the affirmative defense of divisibility. And second, they would have to put forth evidence that there's a two-step approach. First, that they have to show that the harm was theoretically capable of apportionment. And it's not based on volume. It's based on the harm of the particular contamination to the property. Go ahead. I'm sorry. My question was whether the government was proceeding under a court order, a settlement, a consent decree. Was there something that compelled them to clean up the non-benzol waste? Well, the government was – let's start here. The government was compelled to clean up the benzol waste. And you're saying to do that, they had to clean up everything because they couldn't divide the different contaminants. Correct. And then there's the question of equitable allocation between the government and the oil companies for who should bear those costs and what percentage of those costs should be borne by which party. But the government never did that. And essentially, they're trying – I mean, the parties cannot stipulate to – two co-tortfeasors or co-polluters here cannot stipulate to overcome – to override joint and several liability. Why not? Because that – let's say the oil companies – Yeah, I mean, I agree. But you can stipulate to anything as long as it's based in fact or something. You can't stipulate – two joint tortfeasors cannot stipulate to divide up liability and then make their liability to third parties something other than joint and several liability. Look, so the arguments you're making were made to this court in a motion to recall the mandate. Your Honor, the argument that we were making was made to – was that the oil companies were responsible – should not have been responsible for anything. That the government was an arranger for non-Benz oil waste as well as for Benz oil waste. So the oil companies should have had no liability. And on – what's interesting is – I'm talking about the motion to recall the mandate because after the court issued its opinion, the mandate issued. Correct. And I guess when they got back down to the district court, all this – they realized that there were some problems with what the – at least in the on-the-ground implementation of what we did, that there were some problems with that. And so there was a motion to recall the mandate, to grant a petition for rehearing, and to basically correct the opinion. And the oil companies filed that motion, and we just flat out denied the motion. Your Honor, I'd like to – For reconsideration. You know, the motion to recall the mandate. We just denied it, and the case went back to the district court. That's correct. And that's where you are today. You are – I don't want to say – I don't like to use the word stuck, but you've got a tough road to hoe in light of what we said, is that the government is not responsible for the non-Benz oil. Well, I'd like to start hoeing that road, if I may, Your Honor. I understand. It would be – it's helpful to look at what the government said in response to the motion to recall the mandate and for the petition for rehearing en banc. The government said, We agree with the oil companies that the U.S.'s liability for benzoyl-related waste at the site made all the waste at the site potentially subject to allocation between the oil companies and the U.S. pursuant to Section 113F1. So the government – we agree with that position. That's our very position here today, and that's the position that the government told this court why it didn't need to have any further proceedings. So the government made that judicial admission, presumably to gain an advantage. I'm not sure I read that the same way you do, but I understand your point. Well, when the case went back to the trial court, then the parties, after entering into the volumetric stipulation as to the amount of benzoyl waste versus non-benzoyl waste, not the harm caused by the waste or not the other gore factors, not the other numerous equitable allocation factors, the oil companies said we needed a further hearing, a full Section 113F1 hearing on equitable allocation between the government and the oil companies. And that allocation has never – that 113 proceeding has never occurred. And the government, in their brief, has said that they're seeking only to recover the cleanup costs for non-benzoyl waste. But if you look back at the pleadings, the government is actually seeking to recover the cleanup costs for all waste at the site. And then later on, what it's done is it has never segregated out, like, this is the cleanup cost attributable to benzoyl waste. This is the harm caused by benzoyl waste. Let me ask you this. So when it went back down to the district court, as we know, the district court said, no, we're not having a 113. Was it 113? 113, yes, Your Honor. We're not having a 113 allocation trial. Correct. Right? So how did the district court come up with its figures? The district court come up with its – Yeah, the amount that – the judgment that was entered. There were some numbers in that judgment. Yeah, it's approximately – the overall costs, or cleanup costs, claimed by the government, which included indirect costs and agency overhead, was approximately $49 million. And you're saying that that included cleanup for everything, benzoyl and everything? That's everything. That's all in. And then minus 6.25%, which is the volumetric allocation for benzoyl versus non-benzoyl. So, in effect, even though it's not a – I don't think it's a proper allocation, the government has taken into – has availed itself of 113-F1 by saying, we're going to give you a reduction for the waste at the site that we generated. But it's not an appropriate – there was never the 113 hearing where the court can consider – the district court can consider all the equitable factors because the court ultimately concluded that the government had a claim under 107. Let me ask you this. One thing I found really interesting in this case was, you know, the counterclaims that the oil companies had about the original contracts and about the right of indemnity. Yes. You know, all those claims went to the Court of Claims and then up to the Federal Circuit, and there was quite a bit of litigation there. There still is, Your Honor. And ultimately, the oil companies prevailed. In the end, it seems like, you know, the government's going to pay. It's going to pay with the right hand rather than with the left hand. We don't know that to be true, Your Honor, because just two weeks ago the oil companies filed another claim in the Court of Claims seeking to recover $9 million in costs, which the government refused to pay. So they're making us go back – we've gone back to the Federal – time and time and time again. Well, I mean, on this basic claim that we're talking about, I mean, I thought the judgment that the Federal Circuit affirmed was like for almost $100 million. The costs are staggering, and they're continuing to be expended. In the latest iteration, we have, through September 21st of 2022, another $9,100,000 in cleanup costs that the government has refused to pay. I don't know why or what basis they have, given what the Federal Circuit has said, but that's the state of the affair there. And I think that that should be another factor that weighs into the district court's equitable allocation between the oil companies and the government, because you look at the recalcitrance of the parties, and you have a party here, the U.S. government, who implored the oil companies to crank up avgas production during World War II. Neither side really made provision for disposal of the waste, because they had – they were bigger fish to fry. They were in the middle of a world war. But the government then told the U.S. – or the government told the oil companies that we would – we'll cover you for any costs you have associated with the cleanup. So I think when you're figuring in the equities and the fairness of, you know, who should pay what, that is certainly a very important factor. I see that my time has expired, so I'd like to save the remaining 4.33 for rebuttal. Thank you. Now we have Mr. Mergen. Good morning, Your Honor. May it please the Court. My name is Andrew Mergen. On behalf of the Department of Justice, I'm here with Madeline Gallo from the United States Environmental Protection Agency. I want to start by addressing a couple of the questions that came up. It's clear to me that the Court has a really sophisticated understanding of this case, which, as you all know, has a very long history. This issue of this judicial – quote, unquote, the mandate wasn't raised in the opening brief. It was raised for the first time in the reply brief. So also was this concept of joint and several liability raised in the reply brief. But the company's claims about this judicial admission are not new. They were presented to the district court in 2003. That's clear from the company's excerpts of record. It's the same site with the stipulation on ER 107 and 108. And if you see at 108, the companies at the bottom of the page assert again that the United States has conceded away the need for another allocation trial. And then you'll see that the pages between 3 and 18 are not included in that, and the government in those pages explains why there is no such judicial admission. With the benefit of that briefing, if you go to the government's excerpt of record, you will see on SCR 256 the district court, having heard those claims, having heard the positions of the parties, including the United States and the State of California, denied the request for further allocation. So I think the overall effort here, for sure, is to backdoor around this court's decision in 2002, which held that there needed to be no further allocation with regard to the governments, with regard to the non-venzel costs, because the governments simply were not liable for those. The companies then made an effort in the district court, again, as Judge Paez, as you remarked, sort of people had to take in the result of the court of appeals decision and made another run at this, and the district court said no. I should add also that I'm leaving out the cert petitions that were filed because the holding, right, the court's determination, Judge Fletcher's determination, the determination of this court in 2002 is really a key part of this case, and the efforts here today are largely an effort to backdoor, get around that holding. And I think it's probably helpful for me just to take a second, if I could, to talk about sort of CERCLA and the sort of fundamental tort principles that inform the administration of that statute, right? There is this concept of joint and self-reliability that is relevant to an action for costs under Section 107, right? And an important part of that issue is our notions of divisibility, right? And the Supreme Court has given us some guidance on these issues in various CERCLA cases, including Burlington Northern and others. But the idea there is that harms may be divisible, and I think the clearest way to understand what happened in the court of appeals decision is the court found that because the United States could not be held responsible as an arranger for those non-benzolase, those harms were divisible. And the court also made the finding that there was no purpose for allocation because the United States was not liable. And that gets back to another fundamental tort principle I just want to mention briefly, right, which is actions and contribution under Section 113 are actions, as Judge Thomas has made plain in a couple of decisions in the Supreme Court regarding CERCLA, are actions between tort feesers. They are actions for contribution to make sure that somebody doesn't overpay, isn't taking on more than their fair share. And accordingly, those are actions between liable parties, which takes us back to the 2000 decision, which says that the United States is not liable for that non-benzolase. And that is just, simply put, the crux of this case. And the companies realized it at the time. It's why they invested in a CERC petition and why they tried to reopen these arguments below. But what's clear here, going to your question, Judge Beatty, the United States took this on consistent with the way that CERCLA is supposed to work, as a voluntary action to clean up this very hazardous waste site. And under 107, it is entitled to recover its costs. It has sought those costs minus that 6.25% of the benzol it's required, it's stipulated to. And I want to remind the Court, if you look at the stipulation in the SER, there's nothing about volumetric. It's about stipulating to waste costs. How did we get to that 6.25 number? Well, the district court found in an allocation trial in 1998 that the government was probably responsible for 5.5. But the parties stipulated to the bigger number in 2003. Presumably, I think, for one very important purpose, which is to move this case along, right? It's been out there for 30 years. Moving pretty quick. Unless the Court has any questions, I will stop now. So Judge Pius raised an interesting point. With the litigation in the Court of Federal Claims, isn't the end result that the government pays for the cleanup in its entirety? Yeah, I'm glad that you raised that issue. One, I will say as a lawyer for the Environment Division of the Justice Department, I weighed very carefully into what my colleagues at the Civil Division are handling, right? I'm not steeped in the litigation before the Court of Federal Claims. It is clear, however, as your remarks may point, that the government is going to pay for some of this. There are remaining disputes about the kinds of things that the government cares strongly about, and so do the companies, issues related to prejudgment, interest, and the like. So there is continuing litigation ongoing in the Court of Federal Claims. But the United States has been held liable for a significant amount of money. The fact that there's continued litigation just indicates that there are big sums at issue here. But that's all grounded in the original contracts. Correct. The war contracts. And that's why they're being handled by my colleagues in Civil Division and not the Environment Division, right? Those are contract actions. And it makes sense that that action is separate as a matter of law. It does arise in contracts, not under the statute. CERCLA does have a provision regarding indemnification. That's at Section 107E of the statute. And it says nothing about indemnification is intended to put the brakes on these actions, right? And that's what the companies realized when they asked to pursue, when ultimately they went to the Court of Federal Claims to pursue those actions. And it matters a lot as a matter of sort of fiscal law that those claims are settled there, right? Those monies are going to come out of the judgment fund. The government, you know, has a duty to protect that fund on behalf of the taxpayer. And those cases are separate. But it is definitely true, right, that the companies, in a way, this case is about litigation decisions and judgments over the course of 30 years. The companies at one point made the judgment to pursue those indemnification provisions in the Court of Federal Claims. And overall, I think that's worked out pretty well for them, right, not being the expert, but based on what we have in the record before you. And so they are going to recoup some of these monies. And, you know, there are other parties to this case who are not here today. Our brief mentions that shall is out of this case, right? They are seeking indemnification for the cost they paid to us through the Court of Federal Claims action. And that's fine, right? That's the way, in a way, like this case has a unique history. It has 30 years behind it. There's a lot going on here. It has this interesting history about the war effort. But in these kinds of cases, the government voluntarily undertakes a cleanup. That's what Congress charges them to do, to remedy environmental harms. Then they seek the recovery of those costs. And then there can be contribution actions. There can be indemnification actions. But the point is, right, that these costs that we're seeking to recover, it's not a wash. These costs go into the fund so that EPA is ready to go the next time. Right. So there's an important replenishment aspect to this, right? It allows the EPA to get the funds it needs to continue to respond to the next case. So if there are any further questions. One last question. Of course. It's an easy one. I'm just curious. So there's a statement, I can't remember if it was in your brief or the oil company's brief, but that there will be continuing ongoing costs. Yes. Well into the future. Yes. So does that remain part of the case? Yeah. I mean, that's a really important part. I'm so glad you brought that up, Your Honor, because under this 107 action, right, as you saw in the excerpts of record in our briefs, right, there's this remedy that's been imposed, this cap remedy. The harms have been remedied more or less in situ, right? And there are concerns, you know, this is Southern California. There are particular concerns about groundwater contamination and the like. So there are costs associated with maintaining monitoring, to making sure that there aren't leaks, to making sure that everything is up to snuff. And that's just part of the remedy under 107, and it's a really important part of the remedy. So I'm really glad I got a chance to mention that. So I have a question for you. So it seems your opposing counsel's argument was that because of the nature of the contamination where these chemicals and substances are combined, divisibility just isn't feasible and rarely happens, something that can't happen. And it seems the government's position is, well, once the parties stipulate to a percentage of liability, that's sufficient for divisibility. Where's the case law that supports that? Yeah, I think, you know, one thing I'm not – I can't give you a case. I mean, there are many cases on divisibility, and this is a funny sort of divisibility case, right? But if you think about it, going back again to the difference between divisibility, which is a legal issue, right? We make divisibility, and we know this from Burlington Northern. We know it from the other cases that divisibility is based on an issue of law. Well, that's what this court did in 2002, right? It said, as a matter of law, we're not an arranger. But I have a really important point I also want to make in that regard. That's in relation to the district court's trial in 1998 and the district court's decision following trial, which really this is the decision that goes up to you, right? That forms the basis of the case that's reviewed in 2002. And what you see in that decision, and I think this is also reflected by your opinion in 2002, is a real effort by the district court to dig into it. So there's the law issue, right? That's divisibility. That's apportionment. And that issue here we've been judged, as a matter of law, not liable. But there's also, in contribution, that's a matter of equity. 113 tells us that. And if you read the 1998 opinion, you see the district court saying, I've got a big job ahead of me. I have to think about equity here. And he looks at a lot of things. He looks at a lot of things, enormous record about what was going on during the war. You saw mention to the rail cars. Were there other possibilities of setting up treatment facilities? And he digs in. And you know what he does is he does his absolute best as a matter of equity because he's acting before the 2000 decision decision. He's acting in 1998 to look at this big site and make an equitable apportionment. And he cannot do any better than the 5.5% he finds the government liable for. And my colleagues had an opportunity. You know, that was their chance. They had a trial on contribution. They had a trial on how this was going to be on allocation. And the court digs in, and he makes a determination. And in 2003, when we come back from the Ninth Circuit, it's easy because everybody realizes we've had a shot at the equity apple, and this is what we came up with. So the government stipulates to a little bit more. Can I ask you another question? Of course. So once we decided that the government was not an arranger as a matter of law on the record, did that foreclose any equitable contribution? I mean, could the panel have said, well, now we need to just stop right there and just say, okay, now we need to send it back. They weren't an arranger, but maybe they should have some responsibility. I think it did foreclose. And I think what's important, as you consider that issue, is that your decision in 2002 takes a big accounting of these equitable factors, right? I mean, Judge Fletcher also digs in on the rail car issues, and he finds no error there, right? Insofar as the Benzel waste is concerned, he's like, District Court, you did your job, right? I don't have a problem. Equity is a big thing, and you did it correctly. And I think if he had, if the panel, especially given all of the hullabaloo following the decision, if the panel had intended for there to go back and sort of apply some sort of equitable assessment, by gosh, I think we would have heard it from the panel at some point. Okay. Thank you. Any other questions, Your Honors? Okay. Thank you very much. Thank you. All right, Mr. Campbell. Thank you, Your Honor. I'd like to address the issue of divisibility in this Court's prior decision in 2002. I think another way of looking at it, the Court said the government is liable for Benzel waste, and the oil companies are liable for non-Benzel waste. It would be as if it's no different than if the Court said the government's liable for lead contamination and the oil companies are liable for mercury contamination. And both contamination occurred at the same site. There's never been any effort to parse out the damage, the harm to the environment caused by each chemical. And that is the touchstone of divisibility. It's not the volumetric amount. This Court's decision in Pecutis is very clear, and I take exception with what counsel said about divisibility being a legal question. There are two dimensions. It's both a question of law as to whether the harm, not the volume, but the harm to the environment is theoretically capable of apportionment, and second, whether there's a reasonable basis for apportionment based on the harm to the environment. When this Court issued its first opinion in 2002, it said that the government had introduced a dearth of evidence, basically no evidence whatsoever, on Benzel waste contamination. So there's never been any divisibility determination, and divisibility is essential for the Court to rule that there is, to get outside the rule of joint and several liability. This is simply not one of those rare cases where the Court can say that the harm was divisible. Because it's not divisible, you have both parties, the government and the oil companies, are jointly and severally liable for the harm to the McCall site as a whole. And so there has to be equitable allocation to determine who is liable for what percentage. I started to say, at first, if the oil companies became insolvent, the government couldn't say, hey, we're only liable for 6.25% of the waste, or the harm, or the cleanup costs at the McCall site. No, the government would be liable for 100%, the entire cost of the cleanup, because the other jointly and severally liable defendants are insolvent. And so we're not in a situation where we have a... For the government to prevail on its argument, it would have to show that the benzoyl costs, or cleanup, were divisible from the non-benzoyl costs. And it just cannot do that. It has not done that. And I would refer the Court back to, beginning with Atlantic Research, it says, for similar reasons, a PRP could not avoid 113's equitable distribution of reimbursement costs amongst PRPs by instead choosing to impose joint and several liability on another PRP in an action under 107A. And that's precisely what the government is trying to do here. They've had to recast their 107A argument. They're saying, oh, no, we're not seeking all cleanup costs. We're just seeking cleanup costs caused by benzoyl contamination, but that's simply not true. That's not the way they pleaded it. It's not the way they've accounted for it. They haven't accounted for it, and they can't account for the cost of benzoyl cleanup. So in this Court's decision in Whitaker, it said, when the parties... If you have a remedy under 113, which the government does, as it admitted in its post-appeal briefing to this Court, if it has a remedy under 113, it must proceed under 113. So based on the text of CERCLA itself, this Court's decisions... And I'd ask that the Court, if it goes back and looks at the divisibility issue, look at this Court's decision in Pocutus and what the Court said about how rare divisibility is, how it's nearly impossible to prove, but the government is doing it by virtue of just saying, well, we're not seeking all the costs. We're just seeking a percentage of the costs, but there's been no divisibility determination. Liability is joint and several. Because it's joint and several liability, it forecloses the government as an adjudicated polluter from seeking cost recovery under 107, since it is itself responsible for all of the costs of cleanup, subject to equitable allocation with the oil companies. So for these reasons, we would ask that the Court reverse the District Court's decision, remand for further proceedings, specifically a full equitable allocation proceeding under 113F to determine the relative liability between the oil companies and the government for the total cost of cleanup of the McCall site. Thank you. Thank you. That was our last case for argument this morning. We will be in recess until tomorrow morning.
judges: PAEZ, BADE, Collins